IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-377-D

STEWART ENGINEERING, INC., )
)
                Plaintiff, )
)
v. ) **ORDER**
)
CONTINENTAL CASUALTY COMPANY, )
et al., )
)
               Defendants. )

On November 23, 2015, Stewart Engineering, Inc. ("Stewart" or "plaintiff") filed an amended complaint seeking a declaratory judgment [D.E. 8]. Stewart contends that its insurance contract with Continental Casualty Company ("Continental" or "defendant") requires Continental to indemnify Stewart up to the aggregate policy limit of $5,000,000. On March 7, 2017, Continental moved for summary judgment [D.E. 54]. On April 7, 2017, Stewart moved for summary judgment [D.E. 61]. Thereafter, each party responded and replied. As explained below, the court grants Continental's motion for summary judgment and denies Stewart's motion for summary judgment.

I.

Stewart is a North Carolina professional corporation that provides engineering, surveying, and landscape architectural services. Am. Compl. [D.E. 8] ¶¶ 4–5. Continental is an insurance company incorporated and with its principal place of business in Illinois. Id. ¶ 6; see Answer [D.E. 25] ¶ 6. Continental issued a liability insurance policy to Stewart for the policy year April 21, 2014, to April 21, 2015 (the "policy"). See [D.E. 56-3] 2 (copy of the policy). The policy includes a $3 million per claim liability limit for any claim "first made against [Stewart] and reported to [Continental] during the policy year." Id. at 2, 35. The policy also includes a $5 million aggregate claim liability limit for "all claims first made against [Stewart] and reported to [Continental] during

the policy year." Id. The policy also provides that if the liability limit for any policy year is exhausted, "[Continental's] obligation for that policy year shall be deemed completely fulfilled and extinguished." Id. at 35.

Under the terms of the policy, Continental agreed to pay:

[A]ll amounts in excess of the Deductible up to the Limit of Liability that you become legally obligated to pay as a result of[] a wrongful act, . . . that results in a claim anywhere in the world, provided that on the Knowledge Date set forth in Item 4. on the Declarations none of your officers, directors, principals, partners, or insurance managers knew of any act, error, omission, or event that could reasonably be expected to become the basis of that claim.

Id. at 27. Wrongful act is defined as "an error, omission, or other act that causes liability in the performance of professional services for others by you or by any person or entity, including joint ventures, for whom you are liable." Id. at 33. The policy includes a separate provision concerning related claims. Specifically, the policy provides that "all related claims shall be considered a single claim . . . ." Id. at 35. The policy defines "related claims" as all claims arising out of (1) "a single wrongful act," or (2) "multiple wrongful acts that are logically or causally connected by any common fact, situation, event, transaction, advice, or decision[.]" Id. at 32. Thus, all related claims are subject to the $3 million per claim liability limit. See id. at 32, 35.

On January 23, 2013, the trustees of Wake Technical Community College ("Wake Tech") contracted with Pearce Brinkley Cease & Lee, P.A. ("PBCL") for architectural design services for two pedestrian bridges on Wake Tech's North Campus in Raleigh. See Am. Compl. ¶ 18; [D.E. 56-5] 3-4. Wake Tech also contracted with Skanska USA Building, Inc. ("Skanska") to provide construction management services for the two pedestrian bridges. See Am. Compl. ¶ 19. On February 11, 2013, PBCL contracted with Stewart to provide structural engineering design services for the two pedestrian bridges. See id. ¶ 20; [D.E. 56-5] 3; Andrew S. Pordon Aff. [D.E. 65-7] ¶¶ 4, 6, 9. The contract between Stewart and PBCL included deadlines for the schematic design, design development, and construction documents for the two pedestrian bridges. See [D.E. 56-5] 11.

Around February 2013, Stewart began the design development phase for a pedestrian bridge that crossed the Neuse River buffer and connected the plaza between two parking decks to Building F ("Bridge 2"). See Am. Compl. ¶ 24; Pordon Aff. ¶ 10. The bridge was designed to have three long glue laminated truss spans, kingposts, tension cables, and central steel v-column platforms. See Am. Compl. ¶ 24. Stewart presented two glulam truss schematic design options to PBCL. See Pordon Aff. ¶ 11. PBCL selected the single kingpost glulam truss design option. See id. ¶ 12.

Around April 2013, PBCL merged with Clark Nexsen, Inc. ("Clark Nexsen"), and Wake Tech reassigned PBCL's contract to Clark Nexsen. See Am. Compl. ¶¶ 21–22. Similarly, PBCL reassigned the Stewart contract to Clark Nexsen. See id. ¶ 23. Around September 2013, Clark Nexsen notified Stewart that Wake Tech had requested a design for the second pedestrian bridge ("Bridge 1"). See Pordon Aff. ¶ 13. Bridge 1 was designed to connect Building F to Building L. See id. Although the design process for Bridge 2 occurred before the design process for Bridge 1, both bridges had the same engineer of record and project manager. See First Set of Interrogs. [D.E. 56-4] ¶¶ 20–21; [D.E. 65] 8; Pordon Aff. ¶ 14.

In October 2014, construction for both bridges began. See Am. Compl. ¶ 26. On November 13, 2014, Bridge 1 collapsed while workers were pouring the concrete slab for the bridge. See id. ¶ 27. In the early morning on November 14, 2014, Bridge 2 also collapsed. See id. ¶ 28. Four workers were injured and one worker was killed from the Bridge 1 collapse. See id. ¶ 27. There were no injuries from the Bridge 2 collapse. See id. ¶ 28.

On February 6, 2015, Stewart sent a memorandum to the Occupational Safety and Health Administration ("OSHA") and stated "through our own investigation, [we concluded] that the precipitating failure in each instance was at the notched end of a glulam truss and that, regretfully, the failures resulted from a design feature, namely that the notched ends of the glulam trusses were not mechanically reinforced." [D.E. 56-10] 2. On July 24, 2015, Stewart issued a memorandum to the North Carolina Board of Examiners for Engineers and Surveyors in which Stewart admitted that

3

"[b]oth bridges collapsed because of the absence of mechanical reinforcement of notched glulam truss ends." [D.E. 56-8] 8. Stewart also admitted that "[t]he lack of mechanical reinforcement resulted from a miscommunication between Stewart Engineering's Project Manager and its Project Engineer." Id. at 4. OSHA investigated and concluded that "[t]he cause of the failures of bridges Nos. 1 and 2 was the structural design flaw in that the glulam girders were severely notched at each end to facilitate end connections," and that the consultants and contractors failed in their professional responsibility to share their knowledge with the structural engineer concerning the presence of the notches. [D.E. 56-7] 29.

Due to the Bridge 1 and Bridge 2 collapses, numerous individuals and entities brought claims against Stewart ("Bridge Claims"). The five individuals who were working on Bridge 1 when it collapsed asserted claims against Stewart for bodily injury, and in the case of the deceased worker, a claim for wrongful death. See Am. Compl. ¶¶ 40–51. Clark Nexsen, Wake Tech, and Zurich American Insurance Company ("Zurich") also brought claims against Stewart. See id. ¶¶ 52–70. Clark Nexsen asserted direct and indemnification claims for damages incurred in connection with the Bridge 1 and Bridge 2 collapses. See Am. Compl. ¶¶ 62–63. Wake Tech asserted a claim against Stewart for indemnification from claims by third parties in connection with the Bridge 1 and Bridge 2 collapses. See id. ¶ 67. Zurich asserted a subrogation claim based on Skanska's claim for property damage and clean-up costs resulting from the Bridge 1 and Bridge 2 collapses. See id. ¶¶ 52–55.

Continental moves for summary judgment and asks the court to declare that (1) the Bridge claims constitute "related claims" subject to the policy's $3 million claim liability limit, and (2) Continental has no further obligations concerning the Bridge Claims once it has paid the $3 million claim liability limit. See Def. Mot. Summ. J. [D.E. 54]. Stewart moves for partial summary judgment and asks the court to declare that (1) the Bridge 1 and Bridge 2 claims are not "related claims" for purposes of determining whether Continental has a duty to defend Stewart, and (2)

4

Continental has a duty to defend Stewart in any underlying claims and litigation concerning the Bridge Claims. See Pl. Mot. Summ. J. [D.E. 61].

II.

Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

This court has subject-matter jurisdiction based on diversity. Thus, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). The cross-motions for summary judgment require the court to consider the parties' state-law claims and defenses, and the parties agree that North Carolina law applies. Thus, the court applies North Carolina law, and the court must determine how the Supreme Court of North Carolina would rule. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). "If the Supreme Court of [North Carolina] has spoken neither directly nor indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue."

Id. (quotation omitted).[1] In making that prediction, the court may consider opinions of the North Carolina Court of Appeals, treatises, and the practices of other states. Id.

Under North Carolina law, interpreting a written contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). When interpreting a written insurance policy

> [T]he goal of construction is to arrive at the intent of the parties when the policy was issued. Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder. Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.

Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299–30, 524 S.E.2d 558, 563 (2000) (quotation omitted); see Plum Props., LLC v. N.C. Farm Bureau Mut. Ins. Co., 802 S.E.2d 173, 175 (N.C. App. 2017); Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Moreover, coverage clauses are interpreted broadly and exclusionary coverages are construed narrowly. See Plum Props., 802 S.E.2d at 175–76.

A.

The central issue underlying both Continental's and Stewart's motions for summary judgment is whether the Bridge Claims constitute "related claims" as defined in the policy. The policy includes a $3 million per claim liability limit for claims "first made against [Stewart] and reported to [Continental] during the policy year." [D.E. 56-3] 2, 35. The policy has a separate

---

[1] North Carolina does not have a "mechanism . . . to certify questions of state law to its Supreme Court." Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

"related claims" provision that states "[a]ll related claims shall be considered a single claim . . . ." Id. at 35. The policy defines "related claims" as "all claims . . . arising out of: (1) a single wrongful act; (2) multiple wrongful acts that are logically or causally connected by any common fact, situation, event, transaction, advice, or decision[.]" Id. at 32. The policy defines "wrongful act" as "an error, omission, or other act that causes liability in the performance of professional services for others by [Stewart.]" Id. at 33. Thus, under the policy, the Bridge Claims are related if they arise out of acts, errors, or omissions by Stewart that are logically or casually connected by a factual nexus.

In Highwoods Properties, Inc. v. Executive Risk Indemnity, Inc., the United States Court of Appeals for the Eighth Circuit applied North Carolina law and examined a substantially similar "related claims" provision. 407 F.3d 917, 919, 924 (8th Cir. 2005). The Eighth Circuit held that a breach of fiduciary duty claim and a securities claim brought by different plaintiffs against Highwoods were "related claims" because both claims stemmed from actions that Highwoods allegedly took related to its acquisition of another company. See id. The Eighth Circuit concluded that these claims were "related" even though the securities claim (the second-filed claim) included factual allegations that arose after the breach of fiduciary claim was filed. See id. at 924–25. In reaching this conclusion, the Eighth Circuit held that the term "related," as used in the policy, was unambiguous because it has a common and clear meaning that "covers a very broad range of connections, both causal and logical." Id. at 923–25; see Gregory v. Home Ins. Co., 876 F.2d 602, 606 (7th Cir. 1989). The Eighth Circuit also held that a term is unambiguous if "the facts of the case comfortably fit within the commonly accepted definition of the concept, but may be ambiguous if the facts fall on the margins of a broad reading." Highwoods Props., 407 F.3d at 924 (quotation omitted).

Numerous other courts interpreting substantially similar "related claims" provisions have concluded that the provision is unambiguous. See, e.g., W.C. & A.N. Miller Dev. Co. v. Continental Cas. Co., 814 F.3d 171, 175–78 (4th Cir. 2016); Bryan Bros. Inc. v. Continental Cas. Corp., 704 F.

7

Supp. 2d 537, 543 (E.D. Va. 2010), aff'd, 660 F.3d 827 (4th Cir. 2011); Continental Cas. Co. v. Orr, No. 8:07CV292, 2008 WL 2704236, at *3–5 (D. Neb. July 3, 2008) (unpublished). Accordingly, the court predicts that the Supreme Court of North Carolina would hold that the "related claims" provision is unambiguous.

Under the plain meaning of the "related claims" provision, claims are "related" even if they involve distinct acts and decisions and affect separate people. See Am. Cas. Co. v. Belcher, 709 F. App'x 606, 608–10 (11th Cir. 2017) (per curiam) (unpublished); Zodiac Grp., Inc. v. Axis Surplus Ins. Co., 542 F. App'x 844, 849 (11th Cir. 2013) (per curiam) (unpublished); CAMICO Mut. Ins. Co. v. Jackson CPA Firm, No. 2:15-cv-1823-PMD, 2016 WL 7403959, at *10–11 (D.S.C. Dec. 22, 2016) (unpublished).

The Bridge Claims are related claims. The bridge collapses resulted from (and the Bridge Claims arose from) the same design failure by Stewart—"the absence of mechanical reinforcement of notched glulam truss ends." [D.E. 56-8] 8. Even if the design failures are considered separate wrongful acts of Stewart, these wrongful acts are logically and causally connected because there are numerous common facts, circumstances, events, and decisions. Among other similarities, PBCL executed a single contract with Stewart to furnish structural engineering design services for the two pedestrian bridges and both bridges had the same engineer of record and project manager. See [D.E. 65] 7–8; [D.E. 56-3] 3–4; [D.E. 56-4] 6. Moreover, both design failures resulted from "a miscommunication between Stewart Engineering's Project Manager and its Project Engineer." [D.E. 56-8] 8. Although there may have been some different actors and decisions involved in the design and construction of Bridge 1 and Bridge 2, such differences do not defeat a finding of relatedness. See, e.g., Belcher, 709 F. App'x at 609–610. Accordingly, the court grants Continental's motion for summary judgment.

B.

In opposition to Continental's motion for summary judgment and in support of its motion

for summary judgment, Stewart argues that the policy's language is ambiguous and that Continental has a duty to defend Stewart in the Bridge Claims because there is a "possibility of coverage."

As for Stewart's argument concerning ambiguity, Stewart first contends that the policy's definition of "related claims" is ambiguous because it uses, but does not define, the phrase "arising out of." Pl. Brief Supp. Mot. Summ. J. [D.E. 62] 21. Under North Carolina law, a term or provision is not ambiguous simply because one party argues there is some possible alternative meaning. See, e.g., Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970) ("[A]mbiguity in the terms of an insurance policy is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which the company asserts is not its meaning."). Rather, the insurance policy must be read as a whole and in the context of the facts of the particular case. See, e.g., Highwoods Props., 407 F.3d at 924; Hunter v. Town of Mocksville, 237 F. Supp. 3d 349, 361–62 (M.D.N.C. 2017), appeal docketed, No. 17-1374 (4th Cir. Mar. 24, 2017).

According to Stewart, the phrase "arising out of" is ambiguous because it is unclear whether "related claims" must arise "solely" out of the wrongful acts of the insured. Stewart contends that, "[t]he term 'arising out of' could be interpreted to require that the proximate cause of the claims must arise solely from the 'wrongful acts' of Stewart[,]" and that "[t]here is nothing in the record before this Court establishing that Stewart's 'wrongful acts' were the sole proximate cause of the collapses of Bridge 1 and Bridge 2." [D.E. 62] 22–23.

The court rejects this argument. Stewart seeks to strip the phrase "arising out of" from the broader context of the "related claims" provision. The "related claims" provision does not require the court to consider the actions or fault of third parties. Rather, the focus of the "related claims" provision is whether the Bridge Claims against Stewart arose out of a single wrongful act, or multiple wrongful acts of Stewart that are logically or causally connected by "any common fact, situation, event, transaction, advice, or decision." [D.E. 56-3] 32–33. Thus, when determining

whether claims are related, the policy's plain language directs the court to consider only Stewart's wrongful acts, and whether those wrongful acts involve a common factual nexus. See, e.g., W.C. & A.N. Miller Dev. Co., 814 F.3d at 178; Darwin Nat'l Assurance Co. v. Westport Ins. Co., No. 13-CV-02076 (PKC), 2015 WL 1475887, at *13 (E.D.N.Y. Mar. 31, 2015) (unpublished). In order to avoid application of the per-claim limit, Stewart would need to show that the Bridge Claims arose out of Stewart's unrelated and unconnected wrongful acts. See, e.g., Westport Ins. Corp. v. Mylonas, 704 F. App'x 127, 130 (3d Cir. 2017) (unpublished). Stewart has not made this showing.

Next, Stewart contends that the phrase "logically connected" is ambiguous. See [D.E. 62] 23–24. In support, Stewart argues that the differences in the designs of Bridge 1 and Bridge 2 compel the conclusion that claims arising from Bridge 1's collapse cannot be "logically connected" to claims arising from Bridge 2's collapse. See id. at 26–28.

The court rejects this argument. A term is unambiguous if the "facts of the case comfortably fit within the commonly accepted definition of the concept." Highwoods Props., 497 F.3d 917 at 924; cf. Wachovia Bank & Tr., 276 N.C. at 354, 172 S.E.2d at 522. Here, the term "logically connected" has an ordinary meaning and the facts of this case fit comfortably within the accepted definition. Wrongful acts are logically connected if there are shared facts, circumstances, and decisions. See, e.g., Belcher, 709 F. App'x at 609–10; Continental Cas. Co. v. Wendt, 205 F.3d 1258, 1263–64 (11th Cir. 2000). Under the policy's definition of "related claims," wrongful acts can be related even if "they involve distinct acts, affect separate people, and occur at different times." Jackson CPA Firm, 2016 WL 7403959, at *10; see Highwoods Props., 407 F.3d at 924–25; Bryan Bros., 704 F. Supp. 2d at 543. As discussed, numerous shared facts, circumstances, and decisions logically connect the Bridge Claims. See, e.g., Belcher, 709 F. App'x at 609. Among other similarities, both bridges had the same design error due to the same engineer of record, the same project manager, and the same miscommunications. See [D.E. 56-4] ¶¶ 20–21; [D.E. 56-8] 4. Accordingly, the Bridge Claims are "related claims," subject to the $3 million liability limit.

As for Stewart's argument concerning Continental's duty to defend, courts in North Carolina "apply the 'comparison test' which requires that the insured's policy and the complaint be read side-by-side to determine whether the events alleged are covered or excluded by the policy." Plum Props., 802 S.E.2d at 175; see Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C., 364 N.C. 1, 7, 692 S.E.2d 605, 611 (2010); Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 693, 340 S.E.2d 374, 377 (1986). An insurer has a duty to defend if the facts, as alleged, are covered by the terms of insurance policy. See Harleysville Mut. Ins., 364 N.C. at 7, 692 S.E.2d at 611; Plum Props., 802 S.E.2d at 175. An insurer's duty to defend is broader than its duty to indemnify. See Harleysville Mut. Ins., 364 N.C. at 6, 692 S.E.2d at 610; Waste Mgmt., 315 N.C. at 691, 340 S.E.2d at 377. However, "[a]lthough the insurer's duty to defend an action is generally determined by the pleadings, facts learned from the insured and facts discoverable by reasonable investigation may also be considered." Duke Univ. v. St. Paul Fire & Marine Ins. Co., 96 N.C. App. 635, 638, 386 S.E.2d 762, 764 (1990).

The policy states that Continental is not obligated to "defend any claim or pay any amounts after the applicable Limit of Liability has been exhausted." [D.E. 56-3] 27. The liability limit is $3 million per claim, and "all related claims shall be considered a single claim . . . ." Id. at 2, 35. Thus, under the plain language of the policy, Continental has no duty to defend once the $3 million claim liability limit has been exhausted. The Bridge Claims are "related claims" subject to the $3 million claim limit. Accordingly, Stewart's motion for summary judgment is denied.

III.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 54], and DENIES plaintiff's motion for summary judgment [D.E. 61]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and the court's local rules. The clerk shall close the case.

SO ORDERED. This 20 day of March 2018.

                                      JAMES C. DEVER III
                                      Chief United States District Judge